## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN OF TEXAS

| | | |
|---|---|---|
| C.C. INDIVIDUALLY, by and through his next friends, CHARLES CRIPPS AND KRISTIE CRIPPS, | § § § § | |
| **Plaintiffs,** | § § | |
| | § | **CIVIL ACTION NO.:** |
| v. | § § | |
| HURST- EULESS-BEDFORD INDEPENDENT SCHOOL DISTRICT, SCOTT HURBOUGH, INDIVIDUALLY and DAMON EMERY, INDIVIDUALLY | § § § § § | |
| **Defendants.** | § | |

## FIRST ORIGINAL COMPLAINT

**NOW COMES** Charles and Kristie Cripps, the natural parents and as next friend for their son, C.C. (hereinafter collectively referred to as Plaintiffs herein), brings this their *First Original Complaint* alleging that alleging that the Hurst-Euless-Bedford Independent School District (hereinafter referred to "HEB ISD" or the "School District"), Scott Hurbrough, Principal of the Bedford Junior High School ("Hurbough") and Damon Emery, Vice-Principal of the Bedford Junior High School ("Emery"), collectively termed the "School District Defendants," violated the various rights of C.C. as more specifically pled herein. Plaintiff's reserve the right to re-plead this *Original Complaint* if new claims and issues arise upon further development of the facts, as permitted by law. In support thereof, Plaintiffs would respectfully show the following:

## I. INTRODUCTION AND BRIEF REVIEW OF THE CASE

1.     In 2012 when C.C.[1] was twelve (12) years old, he was in many ways, just like many other immature pre-pubescent boys. He found great humor in making fun of others, especially when it came to things like flatulence, genital size, and various bathroom activities. And of course, needling girls and making fun of his teachers were of particular enjoyment. While the other boys could continue in their sophomoric ways without attracting undue attention

---

[1].  C.C. was born on April 16, 2000. During the period of the incidents giving cause to this case he was twelve years old.

or causing any problems for themselves at school, C.C. could not. He on the other hand, always seemed to getting caught acting in a socially inappropriate manner and seemingly always at the most inopportune time and place.

2.      It's important to note, and un-controverted, that C.C. suffers from what is called a problem with "Executive Functioning," which effects his ability to managing his social environment, make good decisions and communicate in an appropriate manner.   This is a symptom of his rather severe *Attention Deficit Hyperactivity Disorder* ("ADHD"[2]) which is amplified by his other various disabilities. In fact, due to these behavioral problems and their effect (C.C.'s inability to benefit academically in the classroom and elsewhere in the school environment) the District rightfully attempted to provide him *Special Education Services*, pursuant to the *Individuals With Disabilities Education Act* ("IDEA"), 20 U.S.C. § 1400 *et seq.* One such service rendered was termed "Social Skills Training,"[3] a program intended to teach C.C. to better differentiate between socially acceptable and non-acceptable behaviors.

3.      For a while things were seemingly moving in a slightly more cooperative direction between C.C., his parents, his Special Education Advocate and School District personnel but at some point things soured. Whether it was because of C.C.'s ever continuing and worsening behaviors; the District's increasing severity in the handling of those behaviors;  the District's worsening relationship with his mother (whose worry increased in direct proportion to the District's severity of punishment); the incessant gaze and ever-increasing pressure upon the

---

[2]

. *Attention deficit hyperactivity disorder* (ADHD), is a psychiatric disorder of the neurodevelopmental type causing significant problems of acting impulsively.   An individual like C.C., who has ADHD, is also easily distracted, has difficulty completing assignments, doesn't seem to listen when spoken to, can't process information as quickly and accurately as others, struggles to follow instructions and will often blurt out inappropriate comments and act without regard for consequences. This is because a child with ADHD has difficulty with what is termed *executive functions.* Executive function refers to a number of mental processes that are required to regulate, control, and manage daily life tasks including and especially social behaviors.

[3]

. Social skill is any skill facilitating interaction and communication with others. Social rules and relations are created, communicated, and changed in verbal and nonverbal ways. The process of learning such skills is called socialization. Interpersonal skills are sometimes also referred to as people skills or communication skills.  Interpersonal skills are the skills a person uses to communicate and interact with others. They include persuasion, active listening, delegation, and leadership.

District from C.C's non-attorney special education advocate;  or simply some combination of all of these items, the "perfect storm" ensued. What previously had been considered simple school problems for C.C., now almost overnight became what was in essence, a conspiracy to kick him out of school by attempting to re-categorize his various indiscretions as felonies and no longer as simple school code of conduct violations.  Once a felony would be incurred, C.C. could be thrown out of school for at least sixty days.

4.      When C.C. made fun of a girl they attempted to have the girl's parents file sexual harassment charges against him. This could surely have been a felony, which would have automatically removed C.C. from school, but these parents refused to participate in the scheme. When he made fun of the size of a boy's penis, District staff again attempted to have that boy's parents file a sexual harassment charge against C.C., but they also refused.  During this period a school administrator even asked one of C.C.'s teacher's to get in his path, and on two separate occasions, cause him to graze that teacher when attempting to pass by her. The teacher attempted to file *Assault On A Public Servant* charges against C.C., also a felony, but the Officer at the police station reduced it a misdemeanor, enough for C.C. to have a criminal charge against him but not enough to get him expelled.

5.      But one day, the inevitable occurred. C.C. did something stupid enough, and with just enough potential severity so to be mis-characterized as a felony by the Vice-Principal, Damon Emery, and others, when he took a picture of his friend sitting on the toilet.  In fact, his friend even smeared his feces on some toilet paper and proudly displayed it for C.C. and another student, so both could take pictures. The Penal Code calls this type of an act a felony if its done without the other person's consent and with the intent to invade that person's privacy.  Emery saw his chance and aggressively pursued the opportunity, finally getting this third parent approached, to file felony charges against C.C.  C.C. was soon thrown out of school. Not surprisingly, the so-called felony charges were categorically dismissed by the Juvenile Justice authorities as were the contrived misdemeanor charges. Plaintiffs assert upon

reason and belief that the actions that brought about the initial filing of these charges were taken with the knowledge of, and under the direction of Defendant, Hurbrough.

6.     The School District personnel have said and will continue to say they actions were legally appropriate and also satisfied the young man's procedural rights as a student with a disability, otherwise pursuant to IDEA, but their position is really without basis. C.C. was treated absolutely differently than other students.  For instance, one student who reportedly searched out and walked up behind another student and stabbed that person with a pencil, only received three days in the alternative school. When another student used his musical instrument to batter another student at a bus stop, he got three days. When another student had traces of drugs on his person he got three days. When another student was found to have drug paraphernalia and a knife, he received five days of suspension. When another student also brought a knife to school, with a bong and also had a long history of persistent misbehaviors, he got ten days in the alternative school. C.C. got sixty days for taking a picture of his friend on the toilet, who essentially posed and gave his permission to take the pictures.  Apparently, School personnel thought C.C.'s action more severe and dangerous to the educational community than the others mentioned above. Clearly he was treated differently than others similarly situated.

7.     In short, this is a case that epitomizes the worst of what is termed, the *Schoolhouse To The Jailhouse Pipeline*. In 2003 the *National Council on Disabilities* wrote a "white paper" for then President George W. Bush called, "Addressing The Needs of Youth with Disabilities in the Juvenile Justice System." It reported what those of us in the field already well-know, that students with disabilities are over-represented in the "school house to jailhouse pipeline."  Students with disabilities are not only more prone to be written up for simple code of conduct violations, but also are more apt to find themselves in an *In-School Suspension* ("ISS"), the *Alternative Educational Program* ("AEP"), Suspension from school, the *Disciplinary Alternative Educational Program* ("DAEP"), the *Juvenile Justice Alternative*

*Educational Program* ("JJAEP") and even in correctional facilities.

8.    The early data and treatises reported that much of the problem was inadvertent, with failure to identify the student as one with a disability as the main problem or the failure to implement correctly the student's *Individualized Educational Plan* ("IEP") or *Behavioral Intervention Plan* ("BMP"). Today we know that the problem is much more insidious. Some school administrators purposefully push students with disabilities who have behavior problems out of their schools because its easier to do that, than serve them. C.C. is apparently one such student.

## II. NATURE AND PURPOSE OF THIS ACTION

9.    Due to the issues noted above, which will be more fully described below, C.C. by and through his next friends and natural parents, Charley and Kristie Cripps, bring forth claims on his behalf pursuant to the First Amendment and the *Due Process Clause* of the Fourteenth Amendment to the Constitution of the United States, as contemplated by the Civil Rights Acts, 42 U.S.C. §1983. In addition, because C.C. is a person with a disability, his parents likewise bring forth claims pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Rehabilitation Act") and for various failures to accommodate him as a person with a disability, as contemplated by the *Americans With Disabilities Act* ("ADA") 42 U.S.C., §12101, et seq. Last, because this case has recently been heard by a Texas Education Agency Special Education Hearing Officer, who issued an opinion in favor of the School District as to whether or not C.C. received educational benefit from the school's *Individualized Educational Plan* ("IEP") for him, to be more fully discussed below, they also bring forth an appeal of that decision pursuant to IDEA.

10.    For any and all of the above, the parents request equitable, remedial and compensatory damages for C.C., pursuant to these various civil rights acts which includes but is not limited to compensatory educational and non-educational services, reimbursement for various out-of-pocket academic and non-academic expenses, costs of representation including attorney fees

and related taxable and non-taxable costs, damages for emotional anguish and other forms of equitable and compensatory relief that this Court may otherwise provide.

## III.  JURISDICTION

11.  Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the laws and rules of the United States as noted above.

12.  Finally, this Court has jurisdiction pursuant to Section 1983 and 1988 of the Civil Rights Act, Title and 42 U.S.C §2000d et seq., so as to award attorneys fees and costs to Plaintiffs.

## IV. VENUE

13.  Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs claims occurred in the Northern District of Texas, Fort Worth Division.

## V. PARTIES

14.  C.C. is a citizen of the State of Texas, and during the time of the incidents giving rise to this Complaint, resided with his natural parents, Mr. Charles and Mrs. Kristi Cripps. At all pertinent times during the period in question, he was a pupil at the HEB Independent School District at the Bedford Junior High School.

15.  Charles and Kristi Cripps are both citizens of the State of Texas and residents of Tarrant County and brings forward this complaint accordingly, not only as next friends, but for in their own Individual Capacity for out-of-pocket expenses incurred as a result of Respondent's actions.  Their address is 1205 Driftwood, Euless Texas 76040.

16.  Defendant Hurst-Euless-Bedford Independent School District (HEB ISD) is a school district organized under the laws of the State of Texas and at all times was responsible for the care, management and control of all public school business within its jurisdiction as to the Student, the training of teachers at the School as to need for the provision of a unique and individualized specialized education plan for students with disabilities, for the student's safety, and for his general course of study. They are also responsible that staff be trained in

assuring the *due process* rights of the students are protected during the investigation of allegations of the Texas Penal Code.  They may be served through their Superintendent, Mr. Stephen A. Chapman, Hurst-Euless-Bedford Independent School District, 1849 A Central Drive, Bedford, Texas 76022.  Their phone number is (817) 399-2020 and their facsimile number is (817) 354-3311.

17.   Defendant Scott Hurbough, is the Principal for the Bedford Junior High School, a school within the Hurst0Euless-Bedford Independent School District (HEB ISD).  At all times he was responsible for the care, management and control of all public school business at the Bedford Middle School; including but not limited to the training of teachers at the School as to need for the provision of a unique and individualized specialized education plan for students with disabilities, for the student's safety, and for his general course of study. He is singularly responsible to assure the *due process* rights of students, like C.C., are protected at the school.  He may be served individually at the Hurst-Euless-Bedford Independent School District, 1849 A Central Drive, Bedford, Texas 76022.

18.   Defendant Damon Emery, is the Vice-Principal for the Bedford Junior High School, a school within the Hurst0Euless-Bedford Independent School District (HEB ISD).  At all times he was also responsible for the care, management and control of all public school business at the Bedford Middle School; including but not limited to assuring the directives of the Principal, Scott Hurbough were fulfilled.  In addition, he was to assure that disciplinary measures were applied uniformly and equitably, and to that end assure that the *due process* rights of students, like C.C., are protected at the school.  He too may be served individually at the Hurst-Euless-Bedford Independent School District, 1849 A Central Drive, Bedford, Texas 76022.

## VI  CONDITIONS PRECEDENT AND ADMINISTRATIVE EXHAUSTION

19.   On or about January 13, 2014, Plaintiffs filed their *Original Petition and Request For A Special Education Due Process Hearing* with the Texas Education Agency.  The Honorable

Hunter Burkhalter was appointed as the *Special Education Due Process Hearing Officer* ("HO") and received testimony on this cause and issued his *Decision* in favor of the Defendant School District on May 13, 2014. The Plaintiffs appeal from that decision.

20. The Hearing Officer issued his opinion finding that the HEB Independent School District provided C.C. a *Free Appropriate Public Education* ("FAPE") as contemplated by IDEA (*see* Decision of Hearing Officer, attached hereto as Exhibit "A"). First the HO incorrectly excluded evidence material to the case, a harmful error. Further, the *Decision* is erroneous as a matter of law. Last, it is not supported by the evidence presented at the Hearing. As such Plaintiff is entitled to an *Order* from this Court reversing and vacating the HO *Decision*.

21. In addition, and also as noted above, Plaintiffs bring forth claims that their son's civil rights, pursuant to Section 504 of the Rehabilitation Act of 1973, the Americans With Disabilities Act and Section 1983 of the Civil Rights Acts, were likewise violated by the Defendant in a number of manners and particulars. As they have previously gone through administrative exhaustion in this cause, which is otherwise required pursuant to IDEA, 20 U.S.C. §1415(1), these claims may likewise proceed.

### VII.  THE DEFENDANT HAS MISREPRESENTED EVIDENCE

22. The Plaintiffs incorporate by reference all the below-related paragraphs with the same force and effect as if herein set forth.

23. The various persons noted in this Complaint who work for the School District Defendant have also withheld evidence and misrepresented the facts to the Hearing Officer in the underlying administrative proceeding

### VIII.  STATEMENT OF FACTS

24. The Plaintiffs incorporate by reference all the below-related paragraphs with the same force and effect as if herein set forth.

A.   ABOUT C.C.

25.   C.C. is the product of a pregnancy contemplated by toxemia, high blood pressure, Rh factor

and placenta previa. He was born five (5) weeks prematurely after a labor of fourteen (14) hours. Post-natal complications included breathing difficulties and severe jaundice. He was placed in an incubator for one day to assist his breathing and received phototherapy for two (2) weeks to treat the jaundice. His developmental milestones were effected such that he was slower than average for his physical and motor development.

26.  C.C. medical history is remarkable for allergies and has experienced multiple breakout of hives, some requiring emergent care and even hospitalization, the impetus of most can be tracked to a stressor in his environment. He is allergic to pork, peanuts, milk, eggs and rice. At the time of his admission at the School District he was not taking any psychoactive medications.

B.    THE FALL OF 2012

27.  The family and school officials met on September 18, 2012 and C.C. was deemed to be a student with a disability and eligible for what is termed "Section 504 Services."

28.  The District began to make a number of disciplinary referrals for what they perceived as minor violation, with the focus on punishing C.C. rather than working with him to address his behavioral issues. On or about October 19th, the Cripps, again fearing their son was being harmed by the District's actions, withdrew him from school. They soon retained a Special Education Advocate, Ms. Debra Liva, in an effort to help reintegrate C.C. into the regular school system but with the necessary accommodations.

29.  On November 12th, the parties met in mediation. Among other things the HEB ISD agreed to provide C.C. a *Full and Individual Evaluation* ("FIE") and have it completed by December 19th. The evaluation was to include a psychological assessment, an assistive technology assessment, a functional behavioral assessment, intellectual and achievement assessments (including writing), an occupational therapy assessment and a counseling assessment.

30.  The District also agreed to provide a "Parent Liaison" to help with communications between the family and school personnel. The District also agreed to provide an "Adult Mentor" for

C.C.  Further, the District agreed to provide the report within five (5) days of the *Admission, Review & Discharge Committee* meeting, then set for January 15, 2013.  The District agreed no consider any behavioral infractions during this assessment period.

31.     The report was neither completed by the agreed upon date, nor  provided within five (5) days of the scheduled ARD Committee meeting, nor did it include or otherwise satisfy all the matters contemplated in the agreement. The family and Advocate complained about these problems.  If the District provided an "Adult Mentor," that person was nowhere to be seen over the ensuing weeks and months. Importantly, the District not only continued consider behavioral infractions during the assessment period, with Hurbough's support, it actually caused them.

32.     During this period, Lynn Parsons, the Educational Diagnostician completed what is termed the "Kaufman Assessment Battery for Children", which measures cognitive abilities.   In his processing speed, C.C. received a 59, which is in the lower end of processing.  This indicates it is difficult for him to process information rapidly. He was thus also eligible for Special Education services as a student with a Learning Disability.

33.     Due to portions of the agreement not being met in a timely manner; including and especially the failure to have the FIE done, a second agreement was reached and the ARD Committee meeting of January 15, 2013, was tabled and was to reconvened on January 31, 2013. There was, however, increasing tension between the District personnel, family and Advocate. Importantly, during this period, C.C. was also deemed eligible for Special Education services under the designation of *Other Health Impaired* due to having Attention Deficit Hyperactivity Disorder and problems in *Written Expression.*

C.      SCHOOL DISTRICT OFFICIALS BEGIN TO CONSPIRE AGAINST C.C.

34.     During this period, C.C. continued to be  written up for a number of rules infractions. He remembers being followed by Scott Hurbrough while he was at school.  C.C. also reports that on at least one occasion Hurbrough followed him to class and peered at him through the glass

window on the door.

35.    Again, the ARD Committee meeting of the 15th re-convened on the 31st of January. Nona Matthews, the School's Attorney, reads into the minutes a relevant section of neuro-psychological testing conducted by a private provider, *Neurogistics,* that stated they found C.C. had significant Anxiety. In regard to C.C.'s problems in bothering peers, the Committee addressed the need to provide him social skills training.

36.    On February 11th, Mr. Emory met with C.C. regarding some referrals from the previous week.  Apparently he had asked a girl in class if, "...she was making porn." The child's parents were contacted by Mr. Hurbough to see if they would like file felony sexual harassment charges against C.C. but they refused.

37.    On the 14th, and during his science class with Coach Shackelford, Ms. McNosky was also in the class but C.C. was not sure why she was there. She was standing at the rear of the class. When C.C. left his seat to get a pencil from the front desk but when he got there, he saw that there were no pencils available. He turned back and started walking to another group of students seated at a table a couple of rows from his table. Ms. McNosky told him to return to his seat and she began walking towards him. She stepped directly and abruptly into his path so he veered to one side to avoid making contact with her. At this time she again moved directly into his path and he again veered in the other direction. They repeated this movement at least once more as they continued walking, she towards C.C. and he towards the group of students.

38.    This happened very quickly and McNosky surprised C.C. by moving into his path when they were so close.  C.C. thought he had avoided colliding with her but her last move into his path occurred when they were too close to each other to avoid contact.

39.    C.C. reports he was surprised because she had stepped into his path before but not when they were too close to each other to avoid contact. In fact, two or three days earlier she did the same thing to C.C. in another classroom.  That time C.C. reports they were far enough apart

that they did not collide when she stepped into his path. Except for the distance, the situation was the same as the one mentioned above. C.C. would change direction to avoid colliding with her and she would purposefully change direction to block his path.

40. In this instance, they did bump into each other. When they made contact she stepped back and he stepped back also. C.C. did not push her. He wasn't hurt and Ms. McNosky did not indicate that she was injured, nor did she make any noise when they made contact. None of the students in the room or even Coach Shackelford made a comment or reacted to them bumping into each other.

41. On or about this same date, C.C. told his therapist that he overheard two teachers commenting, when they say him tapping a pen against a wall, that now they, "...could get him for destroying public property."

42. On February 19th, 2012 Ms. Bowen, the keyboarding teacher, reported that C.C. was extremely disruptive in class that day. He was rough housing with some students, rolling around the classroom in a chair. In addition, that day he was seen bumping into another student's chair, leaning over its side, grunting loudly and belching in a student's face. Most importantly, he was yelling across Ms. Bowen's room that another student's penis was so small that you couldn't even see it, which showed poor social skills and was inconsiderate of the other student's feelings. Emery spoke to this boy's parents and attempted to get them to file charges against C.C. for felony charges of sexual harassment but they too refused. Daniel Emory, the Vice Principal, categorized the incident as one of sexual harassment and investigated it as such. It was during their investigation that he learned that C.C. had photographed a student in a restroom, likely also on the 14th.

43. C.C. was later charged with assault with the contact by McNosky, which she filed as two separate Class C Misdemeanors. One of the alleged incidents occurred on February 14, 2012 and the other on February 20, 2012. Nevertheless, both tickets were written on March 12, 2012, well after the incidents in question. Upon reason and belief, Plaintiffs contend

McNosky actions were both known to and directed by Defendant Hurbrough.

D.     THE PICTURES IN THE BATHROOM INCIDENT

44.     On February 21st, Assistant Vice-Principal, Damon Emery began investigating the allegation that C.C. had called out in class that another student had a small penis, as one of sexual harassment. During this inquiry, the complaining student also told Emery that a friend of his (who Plaintiffs reasonably believe was N., who was present in the bathroom and also took pictures) had witnessed a photo on C.C.'s phone of another student, R.L. while he was in the F-Wing boys bathroom. Emery initiated an investigation into this allegation and took a number of statements. He interviewed C.C. but did not include a statement from him in the investigation.

45.     R.L. is known to C.C. and others as someone who often does crazy and funny things at school. On at least one occasion he was seen "mooning" people. In fact that was why C.C. and another student, N., followed R.L. into the bathroom on that day, especially since R.L. presented a "goofy smile" and was moving fast. When R.L. laughed, C.C. took it as a signal that R.L. was going to do something funny and in fact he did. Entering the bathroom, R.L. went past two empty stalls with functioning doors that would maintained a person's privacy and proceeded to enter the third stall, which had no door at all and was open for anyone to see. R.L. giggled again, as he entered the stall, signaling to C.C. once again that something funny was about to happen. R.L. took his pants down in front of C.C. and N. and sat on the toilet.

46.     When C.C. and N. followed R.L. to the open stall, R.L. continued to laugh and make exaggerated grunting noises and gestures to both of them. Both C.C. and N. took pictures of R.L. and R.L. never told them not to. In fact during the taking of the pictures R.L. continued to laugh and even struck a pose with his palms up while making a funny face. He also had a smirk on his face like he wanted attention. N.and R.L. looked at the picture on C.C.'s phone and R.L. kept on laughing. In fact, R.L. said, "Look a this!" and he held up toilet

paper smeared with feces for all to see. N., R.L. and C.C. all groaned and laughed. Not surprisingly, C.C. thought the picture he took was funny.

47.     In his written statement, R.L. wrote that C.C. took a picture of him while in the bathroom and that he asked him not to show anybody, which aside from N., he did not. The other boys who were there also thought it was funny that R.L. used a toilet without a door, and one boy reportedly even laughed about it, as had R.L. , N. and C.C. Only N., who also took pictures, actually saw the picture, not anyone else.

48.     Nevertheless and notwithstanding significant evidence otherwise, Emery wrote on the 20th, that at the time of his inquiry he determined that C.C. did not have R.L.'s consent to take the pictures. Further, that C.C. intended to invade his privacy, "...by sharing the photos with other students, including the victim's girlfriend, which he actually did." [This was not true] At the conclusion of the investigation he submitted the results to R.L.'s girlfriend and the pictures to Mr. Hurbough and determined that the taking of the pictures in the bathroom was a Title V Felony warranting suspension from school.

49.     In addition, on the next day, February 21st, the School Resource Officer Eberling completed a report based upon the information received from Emory. It included portions of three witness statements and basically reiterated what Emory reported, though she confirmed that only one student in the bathroom saw any pictures, not multiple students (as Emery wrote) and especially not R.L.'s girlfriend. Importantly, it did include at least part of C.C.'s side of the story. C.C. stated he only took the pictures because there were, "...several students telling him to take the pictures..." so he did, succumbing impulsively to peer pressure.

50.     Emery spoke to R.L. 's father in an effort to get him to file charges against C.C., which he did. On the 26th, Officer Ripley with the local law enforcement, reviewed the case and pursuant to Section 15.27 of the Texas Code of Criminal Procedure, a notification letter was sent to the school that C.C.'s case had been referred to the Tarrant County Juvenile Probation Department as a felony. Plaintiffs assert, upon reason and belief, that Emery's actions were

both known to and directed by Defendant Hurbrough.

E.    THE MANIFESTATION DETERMINATION REVIEW HEARING

51.   On March 4th, Emery convened a specialized type of Committee meeting called a "Manifestation Determination Review" (MDR).  The intent is to determine whether or not the behaviors in question were caused by or had a direct and substantial relationship to his behavioral issues and disability. In reviewing the documents and evidence developed by Emery, the Committee determined his conduct in the bathroom was not a manifestation of his ADHD.  This decision conflicts with the diagnostic description for ADHD and the related behaviors of inattention, hyperactivity and impulsivity. Nona Matthews, the Attorney for the school district, clarified that the behavior before the Committee was a new behavior and had not occurred or been documented previously. C.C. was then removed from school and placed in a *Disciplinary Alternative Educational Placement* ("DAEP") for 60 days. Upon reason and belief, Plaintiffs contend that the Committees actions were both known to and directed by Defendant Hurbough.

F.    THE INVESTIGATION IS RE-OPENED

52.   On March 21st, Emery reports he began a follow up investigation pertaining to new evidence that another student was in the bathroom at the same time as C.C., who also took pictures of R.L. One student interviewed reported that they did in fact see another student besides C.C., use a camera and take a picture of R.L. sitting on the toilet. Three out of the six students interviewed also reported they thought it was funny that R.L. would use a bathroom stall without a door. One student reported that he too saw R.L. wipe himself and then held up his toilet paper smeared with feces to show everyone. Notwithstanding the above, Emery held firm on his decision that C.C. invaded R.L.'s privacy and that R.L. did not provide consent for C.C. to take any pictures.

53.   In and around April 4th, the Tarrant County Juvenile Justice authority refused to prosecute the case and sent an email was sent to the School District's attorney shortly thereafter.

Further, the prosecuting attorney for Tarrant County sent to the school district notice of same within two days of the refusal, pursuant to Section 15.27(g) of the Texas Code of Criminal Procedure. Importantly, Mr. Cripps spoke with Ms. Riek, the Special Education Director at the school, about the charges being dropped as well.

G.    THE PERIOD AFTER C.C. WAS REMOVED FROM SCHOOL.

54.   The ARD Committee met again on April 11th to address whether or not the Cripp's request that C.C. be provided Home-Bound services. The notes reflect the Committee reviewed the Manifestation Determination Review of March 4th, but once again rejected the idea that using his phone to take pictures in the bathroom was a manifestation of his disability. The Committee also failed to consider the changed circumstances, that both the felony and misdemeanor criminal charges had been dropped against C.C.

55.   On May 20th, 2012 the ARD Committee met again and again failed to consider the changed circumstances, that both the felony and misdemeanor criminal charges had been dropped against C.C. or reconsider the MDR.

56.   The Committee reconvened on August 29th. The attorney for the school district, Ms. Nora Matthews, recognized that the Juvenile Justice authorities had not prosecuted the purported felony against C.C. The parents wanted the ARD Committee to review the original placement in the DAEP so their son could re-attend school but the school refused. Matthews stated that the decision by the Juvenile Justice system was no "new information that is relevant" to the disciplinary consequences and that the school could make could make its own determination.

H.    PLAINTIFFS FILED A COMPLAINT WITH THE OFFICE OF CIVIL RIGHTS

57.   In the Summer of 2013 the Plaintiffs filed a complaint against the School District with the Office of Civil Rights ("OCR") regarding, among other things, whether C.C. was a victim of retaliation when the incident in question was prosecuted as a felony.

58.   In their investigation the OCR determined that C.C. (by and through his parents) had

participated in a protected activity (advocacy on his behalf); that the District had knowledge of the protected activity; that the District took action against C.C. contemporaneously with the protected activity and there was a causal connection between the protected activity and the adverse actions taken against C.C. thus establishing a *prima facie* case of retaliation.

59.     The OCR then looked to the District to provide legitimate non-discriminatory reasons for the District's actions. With the OCR, Emery stated that among other things, he spoke with the R.L.'s parents about filing charges and sat with them briefly when they spoke to the Police Officer, who later, "...closed the deal." Emery's statement that he didn't know whether or not actual charges had been filed against C.C. is a patently absurd response but it wasn't his only attempt to mislead the OCR Investigator. He also stated that he found out about the pictures when investigating C.C. who "...had sexually harassed another student" when making fun of the size of boy's penis, which is also a complete and knowing mischaracterization of that childish incident. He also told OCR that C.C. had shown the pictures to R.L.'s girlfriend, knowing this statement was also incorrect.

60.     Based upon Emery's testimony, as well as some other school personnel, the OCR found that the District did in fact have non-discriminatory reasons for the punishment of C.C. and thus the Complaint was deemed unfounded.

I.     THE DUE PROCESS HEARING

61.     On January 13, 2014 and pursuant to the *Individuals With Disabilities Education Act* ("IDEA")[4], Plaintiffs filed an *Original Petition and Request For A Due Process Hearing*, pursuant to 34 C.F.R. §300.532 [Appeal] and in concert with the terms and procedures set forth at 34 C.F.R. §300.507 [Filing A Due Process Complaint] and according to the format set forth at 34 C.F.R. §300.508 [Due Process Complaint]. In that *Petition* they argued that the District failed to provide C.C., what is termed a *Free Appropriate Public Education* ("FAPE") by failing to satisfy the procedural and substantive requisites of a *Manifestation*

---

[4].   20 U.S.C. §1400 et seq, *see also* 34 C.F.R. §300.1 et seq. and 19 Tex. Admin. Code §89.1001 et seq.

*Determination Review* meeting and when placing him in a Disciplinary Alternative Educational Placement ("DAEP") and failing to provide him educational services in the least restrictive environment. Further, that the District's one-sided view of the incident in question, could hardly be considered collaborative and in fact was actually hostile as to C.C. Moreover, that while at the time of the incident he was failing five out of six of classes so his IEP could hardly be seen to be providing academic benefit. Last, and in relation to all the above, the educational plan provided and the educational placement mandated was not commensurate with his unique and individualized needs. Plaintiffs also brought forward civil rights claims pursuant to 42 U.S.C. Section 1983, Section 504 of the Rehabilitation Act of 1973 and the Americans With Disabilities Act.

62.     On February 3rd the Hearing Officer issued *Orders* dismissing all non-IDEA claims from the suit, including those related to Section 1983, Section 504 and the ADA, as he had no jurisdiction over such claims.

63.     During the discovery process Plaintiffs requested, among other things, all documents related to disciplinary measures taken against C.C. In that production, the School District Defendants failed to redact the initials of other students. Counsel for Plaintiffs let Counsel for the School District Defendants, Ms. Nona Matthews, know of this issue. Matthews filed a request for a protective order prohibiting Plaintiffs from using these documents, in any form, at the upcoming hearing. Importantly, there was no caselaw, statute or regulation cited for the request. Plaintiff responded with a regulation in support of Plaintiffs position that such documents, when student identifying information was redacted, could be used at the hearing. *See* 19 Texas Administrative Code  ("T.A.C.") §89.1185 [Hearing Procedures], Subsection (e)[5] .

---

[5]

.  Before a document may be offered or admitted into evidence, the document must be identified as an exhibit of the party offering the document. All pages within the exhibit must be numbered, and all personally identifiable information concerning any student who is not the subject of the hearing must be redacted from the exhibit.

64.     The Due Process Hearing was held on March 19-20, 2014.

65.     At the onset of the session the Hearing Officer heard discussion on the District's request for a Protective Order. Notwithstanding the fact the District provided no legal support for their position and the Plaintiffs had provided such support, the Hearing Officer ruled in favor of the District. In doing so, he provided no legal support for his decision.

66.     The Hearing Officer heard argument on Plaintiffs contentions that the picture taking was not a felony and that Emery and others purposefully built a case against C.C. At the Hearing C.C. first spoke on the issue and testified in regard to the taking pictures of his friend R.L. while they were both in the bathroom. C.C. reiterated that he followed his fried N. and R.L. to the open stall that R.L. had a smirk on his face and his hand were up, that he did not cover up his face and had in fact struck a pose with hands up. No one for the District cross-examined C.C.

67.     On the same matters Emery states, "What I saw in the pictures was the other student, who was sitting, sitting on the toilet and he had one hand down grasping his pants and the other hand grasping his shirt. And that was pretty much the pose for all three pictures that were taken. When asked what was Rogelio's "demeanor" in the pictures, Emery responded:

A. "... He was very upset" and later as to the same question about demeanor asked by the School District's Counsel, Ms. Mathews:

A.  "... his demeanor was he doing everything he possibly could, not to be embarrassed, humiliated in such a manner."  And then with a follow up question by the Hearing Officer:

Q.  "... are you indicating that he was trying to shield (his) private area .... his genitalia."

A.  "Yes, sir, that's my indication."

Q.  (By Ms. Matthews) "And did all three pictures depict what you've just described to us?"

A.  "Yes, all three pictures did depict that."

68.     Based upon this particular testimony by Emery the Hearing Officer determined,  among other

things, that the District's decision that C.C. had committed a felony was correct.[6]

J.      POST-HEARING EVENTS

69.     As noted above, on May 13, 2014, the Honorable Hunter Burkhalter, Administrative Law
        Judge with the *State Office Of Administrative Hearings* issued his *Decision And Order*, in
        the above-referenced and styled cause.

70.     A few days later and on or about May 19th, Mr. Cripps went to the Bedford Police
        Department in an effort to retrieve his son's phone, now that the case was over. He had been
        previously told that the Clerk had to check with Detective Ripley to clear the release, which
        he did. Mr. Cripps picked it up on the 21st.

71.     When he opened up the telephone he was surprised to see that pictures had not been deleted
        as he had been told but were still on the phone. Further, that the testimony of Mr. Damon
        Emery at the recent *Due Process Hearing*, was a gross deviation from what in actuality is
        depicted in the photographs. Moreover, since the Hearing Officer's *Decision* significantly
        relied upon Emery's testimony. In fact part of the decision absolutely *turned* on such
        misleading testimony. Most importantly, any review of the pictures would evidence a
        markedly different description than what Emery offered at the Hearing.

72.     Filed under seal and incorporated herein as is if fully set forth, Plaintiffs provide the three
        pictures in question and additionally describe them in this narrative. First and foremost all
        three pictures show the young man sitting on the toilet. There is no door on the bathroom
        stall. The pictures are similar to each other but are somewhat different as well.

        a.      THE FIRST PICTURE

73.     The first picture shows R.L. sitting on the toilet with his clothing completely covering up his
        body, including his genital area. He is wearing a sweatshirt covering up his arms. He is also

---

[6]

. The HO also determined that the procedural and substantive portions of the MDR had been correctly fulfilled, that the process was collaborative and not hostile, that C.C. had received academic and non-academic benefits from the school's educational plan for him, that he served in the least restrictive environment and that the program was sufficiently individualized. Plaintiffs appeal that Decision.

wearing sweat pants pulled up on the front to entirely covered his waist. There is no skin showing beneath his waist at all or anywhere at all for that matter, except for the skin showing is his hands.

74.    His face is looking downward and again, there is no skin showing here at all. Only his hair is showing. There is no demeanor of R.L. in this picture at all. If he was upset, embarrassed or humiliated there is absolutely nothing in the picture at all that would support Emery's statement. More importantly, at the Hearing, and while it would not show up in the transcript, Emery made a grimace attempting to show how R.L. looked while sitting on the toilet. This too was an absolutely false representation of what the picture(s) depict.

75.    Emery also stated that R.L. had one hand down grasping his pants and the other hand grasping his shirt. This statement is likewise 100% incorrect, as was the other. Rather both of R.L.'s arms are resting on the area between his knees and upper thighs with his hands clasped together easily about 12-16 inches away from his genital area and quite obviously not intending to cover anything up at all. There is nothing in R.L.'s placement of his arms that evidences a conscious effort to cover up his body or his genitalia as Emery both stated and quite emphatically inferred. Nor is R.L. using his hands or arms to cover up his genital area, his face (for instance to hide embarrassment as Emery also specifically inferred) or use his hands, arms, feet or legs in any way to support his statement.

76.    C.C.'s simple rendition of the picture is 100% consistent. Emery's testimony is not. In fact his statements noted above are 100% inconsistent. There is nothing in the picture at all that would supports Emery's statements, let alone any reasonable inference, that R.L. did not consent to the picture or expected any aspect of privacy while he was defecating.

77.    As we know, C.C.'s testified that when R.L. defecated and wiped some of the feces on a toilet paper he showed to at least two other students, which Emery's second investigation confirmed.

b.    THE SECOND PICTURE

78. The second picture is substantially similar to the first except that it appears to taken from a closer position. All the misrepresentations and mischaracterizations made by Emery for the first picture hold equally true for the second.

c.     THE THIRD PICTURE

79. This picture is also substantially similar to the first except it too was taken from a closer position. In this picture R.L.'s hands are not clasped anymore. His arms and elbows are clearly apart, so much so that his genital area (which was covered up by his pants, not his arms as Emery clearly misstates) is absolutely open.  Most strikingly, in this picture a very small part of R.L.'s face is showing. It is somewhat difficult to tell but it seems that R.L. is smirking which would be consistent with C.C.'s testimony and not Emery's.

80. Of course, even if for a moment we consider Emery's perception as correct or at least not depicting that R.L.'s face shows a grimace (as if defecating), that is surely not the same thing as Emery's adamant statement that R.L. appeared to be upset, embarrassed and humiliated or attempting to cover up his genital area.

81. In lieu this newly discovered evidence; *see* Tex. R. Civ. P. 324(b)(1); Plaintiffs filed a *Motion For Rehearing* (Tex. Gov't Code §2001.145) and that it be granted; that Emery's testimony be stricken from the record or in the alternative given little weight, that Plaintiff be given the opportunity to procure limited discovery on the issue; that Emery be appropriately sanctioned, 89 T.A.C §89.1170(e), and that previous *Decision And Order* be modified accordingly.

82. The Hearing Officer denied the request noting he had no jurisdiction to *Reconsider* his previous decision under IDEA.

## IX. <u>STATE ACTION</u>

83. Plaintiffs incorporate by reference all the above-related paragraphs, as well as those below, with the same force and effect as if herein set forth.

84. The School District Defendants, in any Official and Individual Capacities and in all matters

were acting under color of state law when they subjected C.C. to the wrongs and injuries set forth herein.

### X. CLAIMS PURSUANT TO THE EQUAL PROTECTION CLAUSE OF THE 14th AMENDMENT TO THE UNITED STATES CONSTITUTION

85.     Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

86.     The acts and omissions of the School District Defendants including and especially Hubrough and Emery, singularly discriminated against C.C. *as a class-of-one* when treating him in a disparate manner as compared to other students similarly situated, thereby violating the *Equal Protection Clause* of the Fourteenth Amendment, for which for which C.C. seeks recovery pursuant to 42 U.S.C. §1983.

### XI. CLAIMS PURSUANT TO DUE PROCESS CLAUSE OF THE 14th AMENDMENT TO THE UNITED STATES CONSTITUTION

87.     Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

88.     The acts and omissions of the School District Defendants, including and especially Hubrough and Emery in conspiring to violate the civil rights of C.C. under IDEA, Section 504 and the ADA, likewise violated his rights pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution, for which C.C. seeks recovery pursuant to 42 U.S.C. §1983.

### XII. UNCONSTITUTIONAL POLICIES, PROCEDURES , PRACTICES & CUSTOMS

89.     Plaintiffs incorporate by reference all the above related paragraphs, as wella s those below, above with the same force and effect as if herein set forth.

90.     Plaintiffs contend that these failures of the School District Defendant to have policies, procedures, practices and customs in place to protect C.C. from the very same professional staff who were intended to keep him safe, additionally violated his rights pursuant to the Fourteenth Amendment of the Constitution of the United States for which C.C. seeks

recovery pursuant to 42 U.S.C. §1983.

91.     During the relevant time period contemplated by this cause of action, the Defendant School District did not follow both federal and state law, federal and state regulations, federal and state executive agency directives in regard to the treatment of a student with behavioral issues.

92.     During the relevant time period contemplated by this cause of action, the Defendant School District did not follow the policies and procedures developed by their own School Board, in regard to the treatment of a student with behavioral issues.

93.     During the relevant time period contemplated by this cause of action, the Defendant School District including and especially the Principal Mr. Scott Hurbough and the Vice-Principal, Damon Emery had an actual policy, practice and custom of conscious indifference to federal law, federal and state administrative directives, and School Board policies and procedures in regard to the treatment of C.C.

94.     Based upon the operative facts, such acts and omissions rise to the level of deliberate indifference and conscious indifference constituting a violation of the First and Fourteenth Amendments of the Constitution of the United States, and for which C.C. seeks recovery pursuant to 42 U.S.C. §1983.

**XIII.   CLAIMS FOR RELIEF PURSUANT TO THE REHABILITATION ACT OF 1973**

95.     Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

96.     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 and its implementing regulations require that each state that receives disbursements, including the state's political subdivisions such as local school districts, must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled child's unique needs, and fails to accommodate that child's disability, it violates Section 504.

97.    Plaintiffs assert that because the Defendant School District failed to provide him an environment that was not hostile, such failures as noted above, have, together and separately, contributed to violating his rights under Section 504, federal rules and regulations promulgated pursuant thereto, upon which C.C. seeks recovery accordingly.

98.    In addition and in the alternative, and to the extent the various School District Defendants failed to satisfy the standards otherwise required by IDEA, and grossly deviated from professional standards of care, such acts and omissions likewise violate Section 504 thereby.

## XIV.   APPEAL OF DUE PROCESS HEARING

99.    The Hearing Officer issued his opinion finding that the HEB Independent School District provided C.C. a *Free Appropriate Public Education* ("FAPE") as contemplated by IDEA.

100.    Plaintiffs appeal that decision for any and all of the following reasons. First, he excluded certain evidence relevant and material to C.C.'s claim that he was treated differently then other students and provided no legal support for that decision.  It was an abuse of discretion and was harmful to Plaintiffs.

101.    Second, and in a related vein, the HO incorrectly weighed testimony of witnesses. He erred and abused his discretion by giving more weight to Emery's controverted testimony as compared to C.C.'s which was never cross-examined.

102.    Third, and as such the *Decision* is erroneous as a matter of law. Specifically, that the attempt to have other parents file criminal felony charges against C.C. for rather typical adolescent behaviors was justified and not hostile.  Further, that even after the District knew that felony charges were not being sought by the local Juvenile Justice Authority, they failed to review such changed circumstances, at the young man's ARD Committee meeting, as required by IDEA.  Last, that his findings that the process was collaborative, that C.C. received academic and non-academic benefit from the school's program, was educated in the least restrictive environment or was based upon C.C.'s unique and individualized needs, all were in error.

103.    Fourth, that the H.O's numerous findings of fact, in support of the erroneous decision of law,

are not supported by the evidence presented at the Hearing.

104.    Fifth, the HO had a authority and duty to *Reconsider* Plaintiffs request based upon newly discovered evidence and failed to do so.

105.    As such Plaintiff and for any and all the above, Plaintiffs are entitled to an *Order* from this Court reversing and vacating the HO Decision and declaring Plaintiffs "prevailing parties.".

## XV.  RATIFICATION

106.    Plaintiffs incorporate by reference all the above-related paragraphs, as well as those below, with the same force and effect as if herein set forth.

107.    The School District Defendants ratified the acts, omissions and customs of school district personnel and staff.

108.    As a result the School District Defendants are responsible for the acts and omissions of staff who were otherwise responsible for the safety of C.C.

## XVI.  PROXIMATE CAUSE

109.    Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

110.    Each and every, all and singular of the foregoing acts and omissions, on the part of the School District Defendants, taken separately and/or collectively, jointly and severally, whether in any official or individual capacity, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XVII.  DAMAGES

111.    Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

112.    As a direct and proximate result of the Defendant's conduct, C.C. has suffered injuries and damages, for which he is entitled to recover within the jurisdictional limits of this court, including but not limited to:

     a.    Mental anguish in the past;

b.      Loss of educational opportunities; and

c.      Various out-of-pocket expenses incurred by his parents but for the acts and omissions of the School District Defendant.

113.   As a direct and proximate result of the Defendant's conduct, C.C. parents have suffered injuries and damages, for which they are entitled to recover within the jurisdictional limits of this court, including but not limited to:

a.      Mental anguish in the past;

b.      Various out-of-pocket expenses incurred but for the acts and omissions of the Defendant.

## XVIII.  PUNITIVE DAMAGES

114.   Plaintiffs incorporate by reference all the above-related paragraphs, as well as those below, with the same force and effect as if herein set forth.

115.   If the allegations that the Individuals working at the School District, were not forthright with the *Office of Civil Rights* Investigation, nor with the Texas Education Due Process Hearing Officer, such that it is a cover-up and misrepresentation of the evidence, such acts and omissions not only satisfy criteria for violations of civil rights and discrimination basewd upon disability but shock the conscience, but satisfies criteria for punitive damages, as contemplated by Section 1983.

## XIX.  ATTORNEY FEES

116.   Plaintiffs incorporate by reference all the above related paragraphs, as if fully set forth herein.

117.   It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit.  Upon judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to under 42 U.S.C. §1988(b), 42 U.S.C. §794a and all pursuant to 42 U.S.C. § 2000d et seq.

## XX.  DEMAND FOR JURY TRIAL

118.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## PRAYER

119.    **WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against Defendants, jointly and severally, in the manner and particulars noted above, and in an amount sufficient to fully compensate them for the elements of damages enumerated above, judgment for damages, recovery of attorney'+s fees and costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to 42 U.S.C. §1988 and 42 U.S.C. § 2000d et seq.; together with pre- and post-judgment interest, and court costs expended herein, as well as the equitable issues noted above; and for such other relief as this Court in equity, deems just and proper and for such other relief as the Court may deem just and proper in law or in equity.

Respectfully submitted,

Cirkiel & Associates, P.C.

Mr. Martin J. Cirkiel, Esq
marty@cirkielaw.com [Email]
Texas SBN# 00783829
Federal ID 21488
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]

**ATTORNEY FOR PLAINTIFFS**